

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF LOUISIANA
LAFAYETTE DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | * | CRIM No. 6:97-CR-60039-1 |
| *Plaintiff,* | * | |
| v. | * | Hon. Terry Doughty |
| MANUEL DAVID HERNANDEZ, | * | |
| *Defendant.* | * | *Mag. Whitehurst* |

## EMERGENCY MOTION TO MODIFY SENTENCE
## PURSUANT TO TITLE 18 U.S.C. §3582(c)(1)(A)

COMES NOW, MANUEL DAVID HERNANDEZ, proceeding in *pro se,* and requests

this court grant a modification of sentence for extraordinary and compelling reasons

pursuant to 18 U.S.C. §3582(c)(1)(A).

Specifically this request is made pursuant to the "extraordinary and compelling

reasons" exception to the bar on inmate-initiated requests for §3582(c)(1)(A)(i) relief.

For the reasons and arguments made in the brief to follow, this court should grant

this request for sentence modification and reduce my sentence to a "time served"

duration, and include what special conditions of release it may deem necessary to

preserve the interests of justice moving forward.

This may include, but is not exclusive to, Residential Reentry Placement, Home

Detention, and/or extended supervised release terms.

## Table of Contents

JURISDICTION AND LEGAL AUTHORITY..........................................................................2

EXTRAORDINARY REASONS EXIST AND REQUIRE THIS MOTION BE GRANTED....4

HOW COVID-19 KILLS PEOPLE.........................................................................................5

MY RISK OF DEATH IS VERY HIGH DUE TO MY HEALTH CONCERNS AND MY

    GENDER..............................................................................................................................6

MY RISK OF DEATH FROM COVID-19 IS INCREASED DUE TO THE INABILITY OF

    THE BOP TO ADDRESS THE SPREAD AND TREATMENT OF THIS INFECTION.....7

EXTRAORDINARY AND COMPELLING REASONS NOT RELATED TO HEALTH, BUT

    DUE TO PROCEDURAL BARS TO SENTENCING RELIEF EXACERBATED BY RISK

    OF DEATH BY COVID-19................................................................................................8

BRIEF LEGAL ANALYSIS OF PROCEDURE AND PRECEDENT......................................11

    A) §922(g) and Predicate Burglaries as "Crimes of Violence"................................................11

    B) "Stacking Gun Charges"......................................................................................................14

    C) Rehaif..................................................................................................................................15

    D) Jurisdiction, Merit, and Relief............................................................................................17

    E) Resentencing Considerations...............................................................................................17

Conclusion..............................................................................................................................19

## I.      JURISDICTION AND LEGAL AUTHORITY

This Court has and maintains original jurisdiction over the prosecution, sentencing, and

continued legal remedies sought while my sentence is ongoing. No jurisdictional transfer,

through 18 U.S.C. §3605, nor any other avenue, has been sought.

The authority of this Court to grant requests for sentence modification after the finality of sentence is reached generally comes from 18 U.S.C. §3582. This statute is used for retroactively applied sentencing guidelines reductions, Rule 35(a) clerical error corrections, Rule 35(b)/§5K1.1 sentencing reduction requests from the government for substantial assistance, and Compassionate Release.

Compassionate Release, as a program of the Bureau of Prisons (BOP), is codified in §3582(c)(1)(A) and has been the exclusive right of the Director of the BOP to request these types of sentence reduction for the entirety of the modern sentencing scheme. That was, however, until the passage of the First Step Act of 2018, Pub L. 115-391.

The First Step Act created an avenue wherein an inmate can directly request a sentencing modification under (c)(1)(A), and circumvent the requirement that the Director of the BOP initiate that request, under specific conditions.

> "[T]the court, upon motion of the Director of the Bureau of Prisons, or upon motion of the defendant after the defendant has fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier, may reduce the term of imprisonment (and may impose a term of probation or supervised release with or without conditions that does not exceed the unserved portion of the original term of imprisonment), after considering the factors set forth in section 3553(a) to the extent that they are applicable, if it finds that —
>
> (i) extraordinary and compelling reasons warrant such a reduction;
>
> … and that such a reduction is consistent with applicable policy statements issued by the Sentencing Commission" §3582(c)(1)(A).

The burden of the defendant, when requesting this modification of sentence is three-fold. First, he must use his administrative remedies to give the BOP the opportunity to grant his request. Full exhaustion, or 30 days from initial request, is required before a Court may consider an inmate-initiated §3582(c)(1)(A) request.

Once that 30-day time frame has lapsed, the Court may only grant a request for sentence modification under this section if it finds that "extraordinary and compelling reasons warrant such a reduction."

The remainder of this brief will describe why my case, my health, and the COVID-19 situation present extraordinary and compelling reasons to grant my request for sentence modification.

## II.      EXTRAORDINARY REASONS EXIST AND REQUIRE THIS MOTION BE GRANTED

"Sars-Cov-2" is the name of the novel caronavirus that has gripped the world for the last six months. The disease it causes is called the Caronavirus Disease of 2019 (hereinafter "COVID-19"). Beginning in the Wuhan province in China in the Fall of 2019, it quickly left mainland China with many traveling Chinese that were celebrating the Chinese New Year in different destinations around the globe.

COVID-19 has an alarming transmission and mortality rate. These are the reasons the entire planet took extreme measures to dampen the spread of this infection. The transmission rates of this disease are high enough to make the spread of the virus exponential.

The exponential rate of infection can be reduced by these mandates, thereby "Flattening the Curve." Orders around the world began to mandate populations distance socially, don face masks in public, and shelter-in-place for months.

The purpose of these mandates was not to eradicate the spread of the virus itself, as that is simply not possible. The purpose was to reduce the rate of infection sufficient to allow healthcare mechanisms around the world to treat serious cases without being overwhelmed with sick and dying patients.

These measures work, however no ability to flatten the curve exists inside the BOP for inmates and staff. This is simply a side effect of the apparatus of incarceration, especially here in USP Florence.

What began to emerge in March and April of this year (2020) was that certain populations were at much greater risk to die from a COVID-19 than others.

My existing medical conditions, as well as my ethnic/demographic makeup, but me at a greatly elevated risk of death if I contract this illness. As I will demonstrate in this section, the risk to me is recognizable, factual, and amounts to an extraordinary reason to grant this request.

## III.     HOW COVID-19 KILLS PEOPLE

COVID-19, known scientifically as SARS-CoV-2, is a novel coronavirus much like the famous namesake "SARS" (SARS-CoV-1).

This virus causes havoc in the lungs, specifically disrupting the capacity of our alveoli to hold air, causing them to fill with fluid. Our immune system's response often causes more damage in the short term than it repairs due to overreaction.

"Viruses that infect endothelium may induce more significant lung injury particularly to the alveolar epithelium as a result of increased vascular permeability, edema, and spatial proximity to alveolar cells. Release of proinflammatory cytokines, NO, and ROS from epithelium and leukocytes can enhance endothelial permeability and disrupt the integrity of the endothelial-epithelial barrier. Damage to alveolar epithelium can expose and increase the susceptibility of localized endothelium to injury. Increased vascular permeability and pulmonary edema impairs efficient gas exchange between the airways and blood, resulting in respiratory distress. **Thus, endothelium damage caused directly by virus or indirectly by inflammatory processes can play a significant role in pulmonary injury in response to respiratory infection.**"[1]

## IV.  MY RISK OF DEATH IS VERY HIGH DUE TO MY HEALTH CONCERNS AND MY GENDER

In Italy, arguably the hardest-hit country with early outbreak cases outside of China, respiratory failure was the most common cause of death from COVID-19, where respiratory failure complications are present in 96.5% of fatal cases there.[2]

A preliminary report from New York COVID-19 deaths, of those under 65 years old who died from this infection, nearly 96% had pre-existing conditions which were fatally exacerbated by COVID-19.[3] The single most common comorbid condition associated with death from this virus is Hypertension.

---

1   Chest CT manifestations of new coronavirus disease 2019 (COVID-19): a pictorial review. Eur Radiol (2020).Ye, Z., Zhang, Y., Wang, Y. et al.  https://doi.org/10.1007/s00330-020-06801-0.

2   See "Report on the Characteristics of COVID-19 Positive Deceased Patients in Italy." Original Italian report available at: http://www.iss.it/documents/20126/0/Report+per+COVID_20_3_2019.pdf/ Translated into English here: https://bit.ly/2WWEu4q.

3   https://www1.nyc.gov/assets/doh/downloads/pdf/imm/covid-19-daily-data-summary-deaths.pdf.

Patients with per-existing medical conditions like hypertension, develop Acute Respiraty Distress Syndrom (ARDS, formerly called "SARS") at a much higher rate than the general population. More than half (52.4%) of patients that develop ARDS will die from COVID-19.[4]

It is easily verifiable from my BOP medical records that I have a long medical history of hypertension, that has been treated for many years during my incarceration.

In addition to this, men are more than twice as likely to die of COVID-19 than women (70.3% of all deaths from COVID-19 in a study with n=524, p=0.016.[5, 6]

## V.      MY RISK OF DEATH FROM COVID-19 IS INCREASED DUE TO THE INABILITY OF THE BOP TO ADDRESS THE SPREAD AND TREATMENT OF THIS INFECTION

The chances that my hypertension will result in my death from this virus are compounded by my gender, and my incarceration. The preeminent expert on disease transmission in prisons is Dr. Jaimie Meyer, Assistant Professor of Medicine at Yale School of Medicine.

Dr. Meyer has testified, under penalty of perjury, in federal district court, the following:

- Segregation and Solitary Confinement is not an effective disease containment strategy;

- Prisons have vastly reduced prevention opportunities for curtailing the spread of disease through distancing or hygiene;

---

4   Clinical Course and Risk Factors for Mortality of Adult Inpatients with COVID-19 in Wuhan China: a Retrospective Study; 395 The Lancet 1054-62 (Mar. 28, 2020), https://bit.ly/3eNqDmD.

5   In this context, "n=" refers to the number of patients in the study and "p=" -value: the probability of obtaining results as extreme as the observed results of a statistical hypothesis test, assuming that the null hypothesis is correct.. A smaller p-value means that there is stronger evidence in favor of the alternative hypothesis.  A p-value less than 0.05 (typically ≤ 0.05) is statistically significant.

6   Gender Differences in Patients with COVID-19: Focus on Severity and Mortality; (2020), *Jian-Min Jin*, et. al., Frontiers in Public Health.

- Inmates are more susceptible to acquiring infectious viruses;
- Prisons lack the medical facilities to deal with, diagnose, manage, and treat COVID-19;
- As the infection rate climbs, this ability will diminish even further;
- Therefore, individuals in custody are of significantly higher risk of contracting and dying from COVID-19, regardless of how drastic measures are taken by a the BOP.[7]

No matter if I am in my cell, in the general population, or if I am totally cut off from the general population in administrative segregation, my risk for infection, ARDS, and death from COVID-19 is not diminished.

It is undeniable that I am of much higher risk to contract and die from COVID-19 so long as I remain in prison here. My survival hinges on my ability to isolate myself, away from prison, and have the care of a hospital if I end up contracting this virus after my release from custody.

## VI.  EXTRAORDINARY AND COMPELLING REASONS NOT RELATED TO HEALTH, BUT DUE TO PROCEDURAL BARS TO SENTENCING RELIEF EXACERBATED BY RISK OF DEATH BY COVID-19

Aside from the very real health risks associated with the COVID-19 pandemic, and the lacking response from the Bureau of Prisons to properly address the spread of that virus in USP Florence, there are legal reasons which create a compelling and extraordinary reason to consider this request.

---

7   "Declaration of Dr. Jaimie Meyer," No. 1:20-CV-01803-AKH (S.D. New York, PACER Doc. 42, March 16, 2020)

There are several issues that I have brought up on *habeas* appeal in several previous filings with this Court. These were ordered on in February, and some where dismissed with prejudice, and some without prejudice [Doc. 213 & 214].

The arguments currently before the Fifth Circuit Court of appeals, as well as the arguments in my subsequent filings [Doc. 182, 189, 190, 206, and 211] deal with two main merits issues. See Case No. 18-30712 (5th Cir. _____, appealing the decision by this Court to deny §2255 arguments under the 2015 decision in *United States v. Johnson*, 576 U.S. 591 (2015).

These arguments are:

I.  Whether the definitions of "violent crime" that were struck down as unconstitutionally vague by *Johnson,* and the subsequent decisions in *Dimaya,*[8] *and Davis,*[9] make new rules that apply retroactively to the cases which were used to predicate the sentence decision in my case.

II. Whether the ruling in *Rehaif*[10] invalidates my convictions for my §922(g) convictions. *Rehaif* requires the government to prove I was aware that I was prohibited from owning firearms before a conviction for prohibited-possession prosecution can prevail.

These issues are still outstanding. First, the *Johnson* decision is currently pending before the Fifth Circuit. The *Dimaya* and *Davis* ruling, progeny of the *Johnson* decision, were dismissed without prejudice because I submitted those arguments after briefing at the Fifth Circuit was considered fully made.

---

8   *Sessions v. Dimaya*, 138 S. Ct. 1204 (2018).

9   *United States v. Davis,* 139 S. Ct. 2319 (2019).

10  *Rehaif v. United States,* 588 U.S. _____ (2019).

Moreover, this court decided that the *Rehaif* decision could also not be considered in any of those filings. This was ordered first because various courts have not considered *Rehaif* as having established a new rule, nor has it been considered (even if a new rule was made) to be retroactively applicable. Second, because that argument is properly brought under §2255, to consider it would be to consider a successive *habeas* filing without first gaining permission from the Fifth Circuit to file it. Doc. 213 at 9.

Finally, that ruling addressed the changes made by the First Step Act regarding the "stacking" of 924(c) sentences. "[T]he First Step Act removed the automatic imposition of a 25-year sentence for a second or subsequent conviction for using or carrying a firearm under Section 924(c) and instead conditioned such a sentence on the existence of a prior final *conviction* for that offense." Doc. 213 at 6.

This did not prevail for me, just as the previous merits arguments had failed as well."However, the statute specifically provides that this new minimum applies to defendants convicted before the Act became law *only* if they had not yet had a sentence 'imposed'." *Id.*

Here, I am not asking for a fully briefed decision on *Rehaif, Dimaya, Davis, Johnson,* or The First Step Act.

Here, I make the argument that nobody is contesting the fact that a sentence in my case today would be ***substantially*** lower than 867 months. That sentence would be of such a length as to now warrant an inquiry as to whether or not I would already have served my full term of incarceration.

If that were the case; If I were sentenced under today's law and precedent; and if that sentence under today's law and precedent would result in a sentence of such length that it is

already served, **then the procedural bars that I encounter which prevent my sentence from being reduced will quite possibly prove fatal.**

Even worse, because my case is not a Capital case, I am afforded much less by way of resources to seek counsel and remedy in ways that could positively effect my sentence. The result, however, will be the same. I will die in prison, and this will likely be due to contracting the COVID-19 disease, if this Court does not act on the merits of this motion and reduce my sentence now.

Inaction here is tantamount to this Court tacitly approving Capital punishment for my crimes, and would constitute an egregious miscarriage of justice.

## VII. BRIEF LEGAL ANALYSIS OF PROCEDURE AND PRECEDENT

To begin, the arguments made, which are either pending appellate review, or were made in filings after the appellate briefing was fully made, are not binding precedent.

The decisions that have come after the *Johnson* case, which was the impetus of the current §2255 review before the Fifth Circuit, and the decision in *Rehaif*, create a situation that points strongly toward a coming relief in sentence.

These arguments should be considered for their merits, as a finding of merit would require this court to conclude two important facts: (1) that I am serving a sentence beyond that which I should be serving, and (2) that to continue serving that sentence, having acknowledged that each extra day constitutes injury to me, requires unconscionable violation of §3553(a) for converting it into a death sentence.

This motion is made properly under 18 U.S.C. §3582, which contains provisions for retroactive applicability of sentence reduction policy of the Sentencing Commission (§3582(c)(2)(B)), and provisions for prisoner-initiated sentence reductions for exceptional and compelling reasons (§3582(c)(1)(a)(i)).

## A)    §922(g) and Predicate Burglaries as "Crimes of Violence"

The decision to defer to the 7th Circuit's ruling in *Shields v. United States,* 885 F.3d 1020 (7th Cir. 2018) (declaring the Illinois statutes for Burglary were too broad to be considered enumerated in the Armed Career Criminal Act) is courteous, but not binding on this Court, notwithstanding the oblique.

To date, the Fifth Circuit has not ruled in any way on the merits of this argument. Neither has it considered the merits of any argument comparing "residential burglary" from 720 ILCS 5/19-3(a) against the particularly enumerated "burglary" crime from §924(e)(2)(B)(ii). This court is free to come to its own conclusions, but instead, it punted such an analysis by relying on *United States v. Marroquin,* 884 F.3d 298, 300 (4th Cir. 2018).

*Marroquin,* like *Shields*, has no controlling effect on district courts in the 5th Circuit, although guidance gathered from sister circuits is certainly preferable to no guidance at all. However, *Marroquin* deals only with interpretation of state-specific criminal statutes only insofar as they apply to the application of guidelines provisions.

In a statutory scheme, like the one contained in the Armed Career Criminal Act (ACCA), however, a categorical approach is taken to determine if the state statute meets the general

elements of the applicable federal statute for the crime-type. See *Taylor v. United States*, 495
U.S. 575, 600 (1990), and *United States v. Vidaure,* 861 F.2d 1337, 1340 (5th Cir. 1988).

As it applies here, *Shields* takes the correct approach (categorical) to analyze the
"residential burglary" statute in Illinois criminal code 720 ILCS 5/19-3(a). However, the
decisions in *Dimaya* and *Davis* came after *Shields*, and both strike at the core of why *Shields*
does not apply here.

In all three cases, the Supreme Court has stated unequivocally that the residual clause of
§924's definition of a crime of violence, wherever it exists, is unconstitutionally vague. In
*Johnson,* this was 18 U.S.C. §924(e)(2)(B)(ii); in *Dimaya*, this was 18 U.S.C. §16; in *Davis*,
this was 18 U.S.C. §924(3)(B).

In all three cases, the categorical approach was used and "judges were required to
disregard how a defendant actually committed the offense, and instead imaging the degree of
risk that would attend the idealized ordinary case of the offense." *Davis,* at 2322 (quoting
*Johnson,* supra, at 2557).

Thus, using the categorical approach was the *cause* of the Supreme Court's
determination that the residual clause of the definition of a crime of violence, wherever it has
been encountered in Title 18 of the United States Code, requires the judge to imagine the
degree of risk that would "attend the idealized ordinary case." *Id.*

The same argument exists here. Because the categorical approach analyzes the
similarities between an Illinois "residential burglary" and "burglary" as contained in §924(e)(2)
(B)(ii), and because this categorical approach expects "burglary" to involve conduct that

presents a "serious potential risk of physical injury to another," then the residual clause of a "violent felony".

When the definitions of "burglary" under state statute run afoul of the residual clause of a crime of violence, that crime cannot itself be considered a "violent felony" of the same reason the residual clause was found void-for-vagueness.

In *Quarles v. United States,* 587 U.S. _____ (2019), "generic burglary" was found to include remaining in a premises elements of state-specific statutes and under §924(e). However, this avoids striking at the heart of the issue: whether or not generic burglary runs afoul of the constitution because defining it as a "crime of violence" simply for it's potential for violence, contradicts the decisions in *Johnson, Dimaya,* and *Davis.*

Upon even a cursory look, it certainly does. Regardless of the 7th Circuit's decision in *Shields,* or the deference to sister-circuit definitions of their in-circuit state statutes from *Marroquin,* it is obvious from the record that the very inclusion of "general burglary" as a violent felony as defined by §924(c)(2)(B)(ii) is too vague to be considered constitutionally valid. Indeed, interpreting it that way requires the same imagination that creates the vagueness invalidity that the residual clause of §924(c)(3)(B) did.

### *B)* *"Stacking Gun Charges"*

There is no doubt in my mind, and no doubt in this Court's opinion, that the First Step Act eliminated the stacked, consecutive, sentences for multiple first-time §924(c) convictions arising from the same case/indictment.

It is stipulated in this courts opinion that, were I to be a pipeline case, it would apply directly to the sentencing in my case.

It is then easy to infer that this court believes that, under the same circumstances that existed at my sentencing hearing, if such a sentencing were to happen today, the consecutive 60-, 240-, and 240-month sentences for Count II, V, and VII (respectively), would not have run consecutive to each other.

§403 of the First Step Act clarifies that multiple counts of §924(c) arising from the same crime, so long as those charges are the first of its kind in a defendants criminal history, does not trigger the 25-year consecutive sentence for these subsequent convictions.

In my case, this is acknowledged by both the Court and the government insofar as the only argument made by the government against such a grant of relief is that the First Step Act did not make the elimination of §924(c) "stacking" sentences retroactive. Doc 208 at 8 (citing, again, non-binding precedent out of another appellate circuit. In this case, the 3rd Circuit's decision in *United States v. Hodges,* no. 1901930, ___ F.3d _____, 2002 WL 253375, at *3 (3rd Cir. Jan. 17, 2020)).

Implicit in both the government's objections, and this Court's denial of that claim [Doc. 213 at 6][11] is an acknowledgment that, were I sentenced today, I would be subject only to consecutive 5-year terms of imprisonment for each of these counts.

That means that if I were sentenced today, the 240-month consecutive sentences imposed would reduce to 60 month sentences, and a total of 30 years would be taken off of my

---

11 "However, the statute specifically provides that this new minimum applies to defendants convicted before the Act became law only if they had not yet had a sentence "imposed" *id.*

sentence. My final sentence, assuming no other arguments that are applicable in my case are considered, would and should now be 507 months.

I have now served nearly 23 years of my sentence, or 276 months, and have a projected release date almost exactly 40 years from now.

Were this to be the only change made to my sentence, I would be released in about 8 years (once good conduct credit and re-entry time-credits are applied).

### C)    *Rehaif*

Notwithstanding the previous arguments regarding the *Johnson, Dimaya, and Davis* rulings, which will one day soon be considered on their own merits, another Supreme Court decision in *Rehaif*.

I ask now that the Court consider, as part of this larger arguments, the application of *Rehaif as* it relates to my case. While it is true that this Court has no jurisdiction to consider the merits of any of these arguments under *habeas* review[12], my request here requires a serious contemplation of their merits to determine if further incarceration could prove fatal to my case.[13]

Under *Rehaif*, my previous criminal record is germane. So is my belief at the time of my prosecution in this case that my previous record did not create a disability to my 2nd Amendment privileges in Louisiana.

While I am ardently of the mind that I had no indication that the previous criminal record, and the disposition of my previous criminal record was in such a state as that my

---

12   Without first obtaining authorization for a successive §2255 filing by the Fifth Circuit...

13   "Fatal" here is used both metaphorically and literally, and is purposely used this way.

constitutional right to possess a firearm was intact, the facts in this case must still be reviewed

for their merits under a *Rehaif* argument.

While this Court concluded that *Rehaif* neither created a new rule, nor is it retroactively

applicable upon collateral review, this conclusion is not supported in the Fifth Circuit. This fact

has been stated *in this very Court*:

> "**Neither the Supreme Court nor the United States Court of Appeals for the
> Fifth Circuit** has addressed the issue of whether *Rehaif* was made retroactively
> applicable to cases on collateral review." *United States v. Kelley,* No 3:18-CR-147
> (W.D. Louisiana, Doughty, May 19, 2020) (Emphasis added).

Other Circuits have come to the conclusion that *Rehaif* is not retroactively applicable on

collateral review, but that has even less controlling force upon this Court than *Marroquin*

because there is no analysis here that would require regional expertise like the interpretation of

in-circuit-state criminal statutes.

This Court, however, punts again and does not consider the merits of *Rehaif* arguments

on collateral review, and does so in both my case, and *Kelley, id.* However, this pleading is not

for collateral *habeas*-style review.

Without the 180-month sentence I received for the §922(g) charges, the 300-month bank

robbery sentence is stripped naked and cannot be cloaked under an "already running

concurrent" denial, like this Court did to my *Johnson* arguments in 2018. See Doc 175 at 9

(quoting *United States v. Huerra,* 884 F.3d 511 (5th Cir. 2018)).

### D)     *Jurisdiction, Merit, and Relief*

Because this motion is properly brought under two equally valid provisions under

§3582, the decision of whether this Court has jurisdiction to consider my arguments herein are

already answered. It does.

If this Court analyses these arguments and concludes, as it should, that these arguments

are compelling, then the choice to act is clear. Inaction here would likely make this court an

accessory to negligent homicide.

### E)     *Resentencing Considerations*

Considering *Rehaif*, my 180-months sentences are structurally invalid. Prejudice is not

obvious, because no argument has yet been made regarding the underlying 300-month sentence

for the two armed robbery convictions.

However, inasmuch as *Rehaif* and the First Step Arguments are validly made here, a re-

sentencing on these issues would not be specific, but general. See Untied States v. Lee, 358

F.3d 315 (finding that resentencing after remand is not limited to a simple calculus generated

by the subtraction of scoring from successful merits argumentation, but such a resentencing is

subject to general sentencing procedures).

Since Lee, however, the Supreme Court has weighed in on this. General re-sentencings

on remand are now required to consider post-sentencing rehabilitation and current statutory

schemes. *Pepper v. United States,* 562 U.S. 476 (2011) ("[A] district court at resentencing may

consider evidence of the defendant's postsentencing rehabilitation, and such evidence may, in

appropriate cases, support a downward variance from the now-advisory Guidelines range.")

The invocation of *Booker* in the *Pepper* opinion reinforced that newer precedent controls sentences on remand. For statutory scheme on resentencing, see *Greenlaw v. United States*, 554 U.S. 237 253 (2008) ("[O]n remand, the trial court can reconfigure the sentencing plan … to satisfy [§3553(a)'s] sentencing factors" which include the kinds sentences [currently] available[14]).

In my case, my criminal history is so old as to warrant a criminal history category of I, *Booker* now creates an advisory, but not mandatory, Guidelines range, and 23 years of Supreme Court precedent and statutory changes warrant substantial review.

Today, a cursory look at my guidelines ranges, criminal history, and new Supreme Court precedent, reveals a sentence below 25 years in total.

The entire purpose of this theoretical thought-exercise is to demonstrate that there is provable injury that can and will happen if the merits of these arguments are not considered by this Court.

That injury is easy to see:

1. Were I sentenced under today's standards, my sentence would already, nor nearly be, complete and I would be out of prison;

2. The novel Caronavirus presents an imminent threat to my life;

3. The BOP is not taking sufficient action to prevent my contraction of COVID-19;

4. If I contract COVID-19, I am at MUCH greater risk of death than the average citizen, both due to my health conditions, and the lacking heatlhcare afforded to inmates at USP Florence;

---

14  §3553(a)(3)

5. If I die in prison from COVID-19, it would be a miscarriage of justice caused simply because no avenue currently exists to remedy the sentencing disparity between myself and contemporary defendants enjoy; a sentence disparity that *neither the government nor this Court disputes exists.*

6. To doom me to an untimely death when these facts are not disputed is an extraordinary and compelling reason to grant this §3582 request.

## VIII.  CONCLUSION

**BECAUSE** my presence in prison puts me at much greater risk of contracting COVID-19 despite any efforts made by the BOP to prevent transmission;

**BECAUSE** conditions of confinement in the BOP are conducive to the rapid of contagions no matter how drastic administrative measures are taken by the BOP;

**BECAUSE** my health problems create an undeniable risk of death were I to contract COVID-19 in prison; and

**BECAUSE** this Court and the government both recognize that I would otherwise be sentenced to at or below the sentence I have already served if I were sentenced under today's sentencing rubric;

Then denying this motion and leaving me in prison converts my sentence to a *de facto* death sentence and violates Due Process because I was not sentenced under the rules of capital cases. It also, therefore, violates the Eighth Amendment's protection against cruel and unusual punishment.

Thus, this Court cannot defer the issue by inaction and must grant this request for sentence modification so I can exist outside prison walls and be protected from unwarranted disease and death by continued incarceration.

WHEREFORE, I pray this court recognize the merits of this request and grant the sentence modification requested herein…

This request is submitted on this ___20th___ day of ___July___, 2020.

MANUEL DAVID HERNANDEZ
USM# 09766-035
USP FLORENCE
UNITED STATES PENITENTIARY
P.O. BOX 7000
FLORENCE, CO 81226

"Certificate-of-Service"

7-07-2020

Dear, Clerk-of-Court, for the "Western District of Louisiana",

I am hereby, filing this:

RECEIVED

JUL 21 2020

TONY R. MOORE, CLERK
WESTERN DISTRICT OF LOUISIANA
SHREVEPORT LOUISIANA
BY

" Emergency Motion To Modify Sentence "

Pursuant To Title 18 U.S.C. §3582(c)(1)(A)

This, is made under the timely-filed,

extension-of-time Motion, I filed with

this honorable court of review on June 22nd, 2020

while in Segregation. at U.S.P. Florence-High...

This motion, is to be included with, and in conjunction,

with the earlier filed, 18 U.S.C. §3582(c)(1)(A) Motion,

and Under Fed.R.Civ.Procedure Rule 15(a), and (d), and (c)

So that this briefing, better reflects, my position,

and is much--- more brouder in scope,

than the earlier filed one...

And, Is Made in Good-faith...

I, Am still in Segregation and Under a tremendous-amount-of stress,

I, have to fight and argue almost every day with my current cellmate.

So, Please Judge Honorable Terry Doughty Please Accept This.

I, am at my breaking-point. Thanks I, Am Manuel David Hernandez
on this 20th day of July, 2020.